**Dossie Wayne KEMP et al., Appellants,**

**v.**

**Leroy BEASLEY et al., Appellees.**

**No. 19017.**

United States Court of Appeals
Eighth Circuit.

Jan. 9, 1968.

Rehearing Denied Feb. 5, 1968.

John W. Walker and Norman J. Chachkin, Little Rock, Ark., for appellants; George Howard, Jr., Pine Bluff, Ark., and Jack Greenberg and Michael Meltsner, New York City, on the brief.

Herschel H. Friday and Robert V. Light, Little Rock, Ark., for appellees; William I. Prewett, El Dorado, Ark., and G. Ross Smith, Little Rock, Ark., on the brief.

Before VOGEL, Chief Judge, and MATTHES and LAY, Circuit Judges.

LAY, Circuit Judge.

Our attention is once again directed to the problem of school desegregation. This case was presented to us once before, see Kemp v. Beasley, 8 Cir., 352 F.2d 14, decided in October 1965 (hereinafter referred to as *Kemp I*). Basically, its history since that time represents an apparent failure by both parties to cooperate in carrying out the mandate of this court for an immediate [1] and efficacious plan of desegregation within the El Dorado School District.[2] The various hearings, amended plans and objections, as well as this appeal, demonstrate that cooperative efforts by the parties to reach a workable agreement short of litigation have reached an unfortunate impasse.[3] Constitutional guidelines exist and should not be so elusive. The District Court is always present to assure the expeditious consummation of steps to "effectuate a transition to a racially nondiscriminatory school system." Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (hereinafter *Brown II*). However, we are confident that facile solutions will not find their genesis in desegregation plans filed with a court.

---

1. We said in *Kemp I*:

 "It is the duty of the Board to propose an acceptable plan in conformity with the view expressed herein and to fill in the details of such plan without further order from the Court. The hour is late and *an adequate plan should be put into operation, not later than the beginning of the second half of the 1965–66 school year.*" (Emphasis ours.) 352 F.2d at 22.

 Although a plan was filed in December 1965, the first time any plan was actually approved by the District Court was in August 1967. And despite this Court's strong reference to the H.E.W. guidelines, the original plan filed was deficient in many particulars, the most obvious being the complete absence of steps to integrate the faculty.

2. In January 1966, the District Court ordered faculty integration to commence in 1966–67. Yet, there were no steps taken whatsoever to implement this until a token gesture was made in 1967–68. This plan, of course, is before us now for review.

3. Much of the delay in all of these cases can be avoided by the parties actively working together toward agreement upon a plan ultimately to be proposed. Guidelines are now sufficiently explicit in this Circuit to enable School Boards to project acceptable, definite plans for implementation without continued hearings and disputes before district courts. See also H.E.W. guidelines, 45 C.F.R. 181 et seq. (1967).

Words alone will not achieve the goal of equality. The initiative and positive actions of school officials are still the true predicate to success of any desegregation plan. The simple, troubling truth becomes increasingly apparent: in a formerly de jure segregated school system, equality of education for Negro students is only as far away as local school boards want it to be. It is true that community understanding is involved as well. However, its growth, too, is dependent on the cooperative attitudes and willing spirit of school boards, administrators and their faculties.

The Supreme Court in *Brown II* recognized the supervisory powers of the district courts in "implementation of the governing constitutional principles" because of their knowledge and proximity to local conditions whereby they can best offer "judicial appraisal." 349 U. S. at 299, 75 S.Ct. at 756. But *Brown II* recognized first and foremost that "School authorities have the primary responsibility for elucidating, assessing and solving these problems * * *." Id. We have attempted to follow this principle in this Circuit, fully recognizing that even the district courts do not have the expertise or time to become the alter ego of school boards in carrying out educational policies.

However, as we indicated in Clark v. Board of Education, 369 F.2d 661 (8 Cir. 1966), transitional periods for gradual integration of grades and faculty are no longer meaningful excuses for school boards ordered to get on with their task of equal education for all. We are here now. We must *now* face the problems with realistic and practical resolution. Laudatory goals and ritualistic phraselogy will no longer rule the day. Within these principles we proceed to review the recurring problems before us.

*Freedom of Choice.*

Appellants challenge the Board's use of the freedom of choice plan. There is no need to repeat our observations made in *Kemp I. Clark,* and Kelley v. Altheimer, 378 F.2d 483 (8 Cir. 1967), concerning the constitutional validity of freedom of choice plans. At the present time, we are still not persuaded that such plans are objectionable per se. But recognition must now be made that the only permissible program is one that works. Or as often repeated, "the proof of the pudding is in the eating." Once again, we give a freedom of choice plan tentative approval solely as a transitional program to achieve a unitary school system. As said in *Kemp I,* it is still in the "experimental stage" and as such can only serve as an "interim measure" and as "a permissible method at this stage." 352 F.2d at 21. School boards must recognize the constitutional inadequacy of maintaining school systems where the formerly all white school has the appearance of only token integration and the all Negro school is still perpetuated as a segregated unit. It becomes judicial hypocrisy to approve a plan which simply continues the *status quo* under the guise that the segregation is no longer coerced. Where "freedom of choice" does not implement, or produce meaningful advance toward the ultimate goal of a racially integrated school system, it cannot be said to *work* in the constitutional sense.

Sometimes goals become elusive when obscured in the controversy over the mechanics with which we pursue them. Many times solutions become obtainable when we simply recall *why* we want to get there. With intended repetition, we recall principles which relate advantages common to all races.[4]

4. "The child is not trained in the way he should go; for he is trained under the ban of inequality. How can he grow up to the stature of equal citizenship? He is pinched and dwarfed while the stigma of color is stamped upon him. * * *

"Nor is separation without evil to the whites. The prejudice of color is nursed when it should be stifled. * * * the school itself must practice the lesson [of equality]. Children learn by example more than by precept. How precious

■ 1. "Separate educational facilities are inherently unequal." Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (hereinafter *Brown I*).

2. "Today, education is perhaps the most important function of state and local governments." Id. at 493, 74 S.Ct. at 691.

3. "It is the very foundation of good citizenship." Id. at 493, 74 S.Ct. at 691.

4. "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. Id. at 493, 74 S.Ct. at 691.

5. "To separate [grade and high school children] from others of similar age and qualification solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." Id. at 494, 74 S.Ct. at 691.

6. "Segregation in public education is not reasonably related to any proper governmental objective. * * *" Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

7. "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does." Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691.

But goals cannot be accomplished with present attitudes. Once again the School Board relies upon the now discarded approach of *Briggs*, first refuted in this Circuit in 1965, when Judge Gibson, in *Kemp I, speaking for this Court,* said:

"In support of their 'freedom of choice' plan the Board places great reliance in the dicta found in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D. S.C.1955) to the effect 'the Constitution, in other words, does not require integration. It merely forbids discrimination.' Therefore, they argue that as long as the Negro is not required to attend the Negro school his constitutional rights have not been violated.

"We cannot accept the position advanced by the Board on this matter. The dictum in *Briggs* has not been followed or adopted by this Circuit and it is logically inconsistent with *Brown* and subsequent decisional law on this subject." 352 F.2d 14, 21.

See also our repudiation of this view in Kelley v. Altheimer, 378 F.2d 483 (8 Cir. 1967), and in Yarbrough v. Hulbert-West Memphis School District, 380 F. 2d 962 (8 Cir. 1967). See specifically the concurring opinion at p. 969.

■■ In the present case appellants urge that they were restricted by the trial court in presenting evidence as to the degree of success of the Board's plan. We recognize the discretion of the District Court to hold separate hearings on the form of the plan itself and the question of good faith efforts of the School Board under a plan. Although the two issues generally coalesce, in the instant case we feel the District Court was simply trying to sift the chaff from the wheat to arrive at the wording of an acceptable plan as of August 1967. The misunderstanding between court and counsel apparently arose from the delay in the hearing of the plan filed by the Board in December 1965. Appellants were attempting to support their objections to the filed plan by evidence of ineffectiveness over two years of operative experience under the plan. Appellants urged that Negro families were intimidated and afraid to exercise their free

the example which teaches that all are equal in rights. But this can be only where all commingle in the common school as in common citizenship. * * * There should be no separate school. It is not enough that all should be taught alike; they must all be taught together. * * * nor can they receive equal quantities of knowledge in the same way, except at the common school."
Speech of Sen. Sumner, Cong. Globe, 42nd Cong., 2d Sess. 384 (1872).

choice of schools. Evidence of alleged intimidation occurring two years ago was set forth. For the time being, we think the trial court's realistic awareness and stated concern is sufficient answer for this. If the allegation is true, we are confident the District Court will not tolerate it. Of course, any coercion of choice is not a free one.[5]

We have sufficient facts before us to pass on both the plan submitted as well as the questioned implementation of this Court's prior decree. We do this to avoid "splintering" of issues on appeal. Cf. A. L. Mechling Barge Lines, Inc. v. United States, 376 U.S. 375, 383, 84 S.Ct. 874, 11 L.Ed.2d 788 (1964).

In the El Dorado School District, the record shows that the freedom of choice plan started in 1965 resulted in 11 Negro children moving into white schools in 1965–66; 97 children transferring by 1966–67; and a total of 293 moving in 1967–68. Under our first opinion, the school year 1967–68 now in session is the first year providing free choice for all grades. Appellees urge that their plan has resulted in 13.6% of integration and in comparison to other school districts this is sufficient progress. We disagree.[6]

However, the disturbing factor is not found in the insufficient number of Negro children moving into white schools. The combined Washington Junior and Senior High School is still providing a racially isolated education to approximately 900 Negro students. In the third year after Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) and Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965), the high school still has an all Negro faculty. In addition, in the six Negro elementary schools the pupils attend under the same racial pattern as before. These schools must still be considered all Negro schools existing in a school system that was created under law requiring separation of races. It becomes self-deception to say that freedom of choice is successfully desegregating these schools. Perpetuation of the all Negro school in a formerly de jure segregated school system is simply constitutionally impermissible.

Thus, we must recognize "freedom of choice" for what it is. It may yet serve as a permissible means to the desired end, but it is certainly not the goal itself.

If desegregation continues at the present pace, the District Court is instructed to see that affirmative steps be taken to supplement or substitute for the current program. There must be positive recognition by school officials of their responsibility to create a nondiscriminatory school system. It is not our role to direct the actual means by which this is to be accomplished. This belongs in the hands of the District Court and the School Board. The District Court is available to continually process ideas and cooperative efforts to accomplish the same. We are not that flexible. What might work for one district could result in mere resegregation for another. But we repeat that further affirmative planning and study is necessary. Community wide planning is essential. H. E.W. is available to offer helpful solu-

---

5. "Whether or not the choice is free may depend upon circumstances extraneous to the formal plan of the school board. If there is a contention that economic or other pressures in the community inhibit the free exercise of the choice, there must be a judicial appraisal of it, for 'freedom of choice' is acceptable only if the choice is free in the practical context of its exercise. If there are extraneous pressures which deprive the choice of its freedom, the school board may be required to adopt affirmative measures to counter them." Bowman v. County School Board, 382 F.2d 326 at 327–328 (4 Cir. 1967).

6. Even if comparison to others' slow progress could constitute legal justification for the plan of a given community, it is still difficult even to give validity to appellees' argument. According to the October 12, 1967, Arkansas Gazette, 86 biracial districts within the State of Arkansas were announced by State Education Commissioner, A. W. Ford, as fully integrated at the start of the 1967–68 school year.

tions. As Judge Blackmun acknowledged in *Yarbrough*, although H.E.W. guidelines are obviously not binding on the courts that "courts should endeavor to model their standards after the executive guidelines." 380 F.2d at 964. The methods adopted by other school districts in Arkansas who have succeeded in changing segregated dual districts into integrated systems are close at hand for ready reference. "Freedom of choice" is not the only plan available.[7] We reemphasize that the burden is on school officials to make work whatever plan is adopted. The burden cannot be passed on to the Negro student or his family.

We now pass to the mechanics of the plan submitted:

*Lateral Transfer and Notice.*

Appellants complain of inadequate notice provisions. In *Clark* we specifically held that,

> " * * * every precaution should be taken to fully inform these people of their rights under this new and unfamiliar system. Only by thorough notice can we be assured that the students and parents * * * are fully aware of their newly accorded rights. Only when the affected persons are aware of their rights can we be assured that they are making independent and informed choices." 369 F.2d at 668.

Notice of "freedom of choice" within the Board's plan is basically as follows:

(1) Undefined distribution of parent letter to only three classes of students ready to begin or enter new school levels;[8] (2) undefined (oral?) notice to all other students not chang-

ing grade levels; (3) choice annually provided, but not mandatory; (4) only students failing to exercise choice into new school levels are assigned; all others remain in same school; and (5) public notice.[9]

The "freedom of choice" plan places the primary burden of desegregation upon the Negro family. As long as this type of plan has been adopted we stress the desirability of eliminating every possible deterrent to its success. In *Clark* we there approved permissive choice for students not changing school levels as an administrative deviation from the H.E.W. guidelines of mandatory choice. We nevertheless required the extent of the notice to be the same for all students. We are now faced with evidence of a plan that has not functioned with measured success. We can do no less here.

■ We feel adequate notice should be in substantial compliance with the H.E.W. guidelines (see Kemp I at 18–19 of 352 F.2d) by directing to every parent either by first class mail or by delivery of the letter and choice form to the pupil with adequate safeguard to assure delivery to the parent. This additional requirement should not be a great burden on the School Board as appellees describe this only as a "minimal administrative detail." Provisions for public notice as required by the trial court should likewise be followed.

However, interrelated to notice is the action of the Board when the student fails to exercise the choice. In *Kemp I* we held that the failure of the plan to provide for some nonracial basis for assignment, if the "freedom of choice" was

---

7. For suggestions of other methods adopted, see Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 573. See Racial Isolation In Public Schools, ch. 4 "Remedy" at 115 (1967), see also n. 18 infra.

8. The school levels involved concern prefirst grade students starting grade school; students ready to start junior high school and pupils ready to enroll in high school.

9. The District Court required the School Board to amend their plan to include public notice: "(i) publish its desegregation plan in a local newspaper as a display rather than a legal ad and (ii) prepare in substantial form and file copies with the Court and with counsel for the plaintiffs the various letters to parents, notice and choice forms that will be utilized by the defendants in implementing its plan."

not exercised, was fatal to the plan. We said:

> "The continuation of the dual attendance areas wherein whites are required to attend all-white schools and Negroes are required to attend all-Negro schools should they fail to elect otherwise is unconstitutional and must be remedied." 352 F.2d at 22.

We cited the H.E.W. guidelines of assignment to the school "nearest their homes or on the basis of nonracial attendance zones." We then said, "If a child is to be given a meaningful choice, this choice must be afforded annually." Judge Gibson said:

> "Although a provision is made for students to escape from the segregated school, the dual attendance area, segregated school system is kept in operation. To illustrate, the present plan has resulted, according to the Board, in only four Negroes enrolling in the first grade, and seven in the second grade in previously all-white classes. *The balance,* which includes the great majority of the Negroes, *attend all-Negro schools as before. This* constitutes only tardy and inadequate recognition of constitutional rights and *must be remedied by an elimination of the existing dual attendance areas for children who fail to exercise a choice.*" (Emphasis ours.) 352 F.2d at 21.

After three years of operation we fail to see any substantial progress in the elimination of the dual attendance zones as discussed in *Kemp I.* Merely saying they are to be eliminated obviously does not accomplish the task.[10]

In *Clark* we said as long as every student was afforded an annual right to transfer schools, it was not required that he annually exercise that right. We approved a plan which *required* only those students entering new school levels to be assigned to schools closest to their residence upon failure to exercise their choice. All other students remained in their previously chosen schools. In doing this, we gave deference to the administrative problems.[11] However, where the result of the plan adopted strongly suggests a segregated system is being maintained, this consideration must be rationally balanced. And the expert advice and planning that have entered into the H.E.W. guidelines should not be totally ignored. This Court said in Smith v. Board of Educ. of Morrilton School Dist. No. 32, relying upon the Fifth Circuit:

> "* * * HEW guidelines * * * are entitled to serious judicial deference. Kemp v. Beasley, supra, pp. 18–19 of 352 F.2d. See, also, Singleton v. Jackson Municipal Separate School Dist., 348 F.2d 729, 731 (5 Cir. 1965); Price v. Denison Independent School Dist. Bd. of Educ., 348 F.2d 1010, 1012–1014 (5 Cir. 1965); Singleton v. Jackson Municipal Separate School Dist., 355 F.2d 865, 869 (5 Cir. 1966)." 365 F.2d 770 at 780.

Where a plan is working with measurable success, perhaps the deviation from that policy would not merit change. We do make strong suggestion for the Board and the District Court to consider the complete adoption of the H.E.W. guidelines in this area. We discuss this only as suggestive circumstance to affirmatively improve the operative effects of the plan of desegregation involved. If the School Board can more effectively speed desegregation by other means, it is not only their prerogative, but their responsibility to do so.

We turn now to other features of appellees' plan. Appellants challenge alleged deficiencies in other areas since this Court's decree in 1965.

*Transportation.*

Appellees pledge a biracial bus system. Yet, out of twenty-one buses, each

---

10. "[C]ontemplation bakes no loaves." Cahn, Confronting Injustice 10 (1966).

11. However, we said *Kemp I,* that "at this late date the administrative problems of the Board may not be used as a tool to deprive individuals of their long denied right to attend nonsegregated schools." 352 F.2d at 20.

serving a group of three schools, only two buses are "integrated" by 1967–68. It is obvious that for this plan to work, Negro students living in the same geographical area as white pupils should share the same buses where they attend the same or contiguous schools. The adequacy of the transportation plan at any time can only be its actual result in terms of integrated use. We are confident that the trial court will properly appraise the system. If greater success is not achieved, the District Court may have to deal with the problem in specific terms.

*Small and Inadequate Schools.*

There is no evidence within the record to support appellants' charge in this regard.

*Pupil-Teacher Ratios and Overcrowding.*

Appellants claim there is a major discrepancy between the white and Negro schools as to pupil-teacher ratios. We feel there is insufficient evidence on this record to demonstrate that these conditions will be perpetuated. Further implementation of freedom of choice should relieve this condition. We are certain that the School Board and its administrators are as interested in the highest level of education for all children as is humanly possible. Of course, any apprehension or perpetuation of unequal ratios which smacks of discrimination can always be brought to the District Court's attention for appropriate relief.

It is true appellees' plan does not set forth any objective standards to measure "overcrowding" such as would require transfer by reason of a rejected preference of any student exercising his choice of schools. However, the District Court has observed:

"[T]he essential criteria is that the determination be uniformly and fairly made throughout the system in a manner to fairly implement desegregation, and in no event is there to be discrimination based on race, color or any other improper consideration."

We feel this is in substantial compliance to the guideline principles. Of course, once again, only the plan that works is the right one.

*Faculty.*

In *Kemp I* we placed confidence in the School Board, believing that the inadequate faculty integration would "be corrected by the Board during the transitional period." 352 F.2d 22. In November and December, 1965, the Supreme Court handed down Bradley v. School Bd. of City of Richmond, 382 U. S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 and Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265, respectively. The Supreme Court observed that racial allocation of faculty "renders inadequate an otherwise constitutional pupil desegregation plan * * *." 382 U.S. at 200, 86 S.Ct. at 360.

At the commencement of the 1967–68 term, despite specific objections filed by appellants back in December 1965, the first token steps to desegregate the faculties of the El Dorado schools were undertaken. At that time six white teachers were assigned to three Negro schools, two at the Washington Junior High and two each at Fairview and Carver elementary schools. This leaves Washington High School, an all Negro enrollment and four all Negro elementary schools with an all Negro faculty. At El Dorado High School, and at both of the predominantly white junior highs, as well as one elementary school, there are no Negroes on the faculty. For the first time one Negro staff member was assigned to each of six other predominantly white schools.[12]

---

12. Appellees also report that:
 "Four (4) white public school music teachers are teaching two days each week in the elementary schools where Negro staff members are in the majority.
 "One white strings music teacher teaches part-time at Washington High School.

 "One white elementary library coordinator works part-time in the elementary libraries where Negro staff members are in the majority." Report filed October 2, 1967.

In *Clark,* we observed that a Board should make "all additional positive commitments necessary to bring about some measure of racial balance in the staffs of the individual schools in the very near future." And as we pointed out in *Yarbrough,* Kelley v. Altheimer suggests "examples of steps which can be taken to effect faculty and staff desegregation." It recommends: (1) *encouragement* of *voluntary* transfers from majority to minority staff situations, and (2) vacancies, *when possible,* to be filled by qualified and competent teachers to effect racial balance. Only if these steps were to fail did we refer staff desegregation to Board assignment.

 Our suggestions in *Kelley,* repeated here, are not rigid ones. Local conditions may command different considerations. However, it is not enough to file a plan only incorporating the policy statements set out in *Clark* and *Yarbrough.* A plan should not only specify "a positive commitment to a reasonable program"; it should also state what that program *is.* This embodies (1) the steps to be carried out, and (2) the time schedule to be followed in doing so. Cf. Bowman v. County School Bd., 4 Cir., 382 F.2d 326, 328 n. 4.

Appellees urge in their brief:

"[T]ransition is complete when the authorities of the district have made clear their commitment to handling this phase of their operations on a non-racial basis, and have confirmed their announced 'good intentions' by affirmatively breaking the pre-exist-

ing racial pattern of faculty assignments. * * * racial balance is no more mandated by the Constitution for public school faculties than it is for the student bodies. The mandate is ending state-imposed segregation based on racial classification."

This rationale adopts the earlier Fourth Circuit view in Bradley v. School Bd., 345 F.2d 310, 320 (1965), when it said:

"The possible relation of a reassignment of teachers to protection of the constitutional rights of pupils need not be determined when it is speculative. When all direct discrimination in the assignment of pupils has been eliminated, assignment of teachers may be expected to follow the racial patterns established in the schools."

This view was promptly rejected and the case reversed by the Supreme Court. Bradley v. School Bd., 382 U.S. 103, 105, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

Appellees' argument that racial balance is not mandated demonstrates continued misconstruction of their constitutional obligation under *Brown,* as interpreted by this Court in *Kemp, Clark, Kelley* and *Yarbrough.*[13] As stated in *Brown II,* " * * * vitality of these constitutional principles cannot be allowed to yield because of disagreement with them." 349 U.S. at 300, 75 S.Ct. at 756.

 Appellees repeat, as they did in *Kemp I,* that to require positive action of integration would require assignment by races, which would be "racial dis-

---

13. In *Yarbrough* this Circuit relied upon the Fourth and Tenth Circuits, as well as the Fifth Circuit, supporting our position. Judge Blackmun said:

"In Kelley v. Altheimer, Arkansas Public School Dist., 378 F.2d 483, 493–494, (8 Cir. 1967), after reviewing *Kemp, Smith* and *Clark* and citing other cases, this court said:

" 'From these decisions, it is clear that affirmative action must be taken by the Board of Education to eliminate segregation of the faculty. While this may well be the most difficult problem in the desegregation process, it has been

made more difficult by the failure of the Board to desegregate the faculties by filling vacancies on a nonracial basis.' [footnote omitted]

"See also United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 868, 892–894 (5 Cir. 1966) and, en banc, 380 F.2d 385 (5 Cir. 1967); Board of Educ., etc. v. Dowell, 375 F.2d 158, 167 (10 Cir. 1967); Wheeler v. Durham City Bd. of Educ., 363 F.2d 738 (4 Cir., en banc, 1966); Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, 472 (M.D. Ala.1967)." 380 F.2d 967.

crimination" in reverse.[14] The Fourth Circuit has responded to such a rationalization with clear voice:

"When school authorities, recognizing the historic fact that existing conditions are based on a design to segregate the races, act to undo these illegal conditions—especially conditions that have been judicially condemned—their effort is not to be frustrated on on the ground that race is not a permissible consideration. This is not the 'consideration of race' which the the Constitution discountenances. * * * There is no legally protected vested interest in segregation. If there were, then Brown v. Board of Education and the numerous decisions based on that case would be pointless.

*Courts will not say in one breath that public school systems may not practice segregation, and in the next that they may do nothing to eliminate it.*" (Emphasis ours.) Wanner v. County School Bd., 357 F.2d 452, 454–455 (4 Cir. 1966).

In view of appellees' continued argument, we feel the plan filed in the District Court [15] is deficient because it expresses no commitment to correct the *present* racial imbalance in the El Dorrado school faculties. H.E.W. guidelines state that "race * * * may not be a factor in hiring or assignment * * * *except* to correct the effects of past discriminatory assignments." 45 C.F.R. 181.13 (1967).[16] This Court in dealing with faculty dismissals and

---

14. Appellees rely on Monroe v. Board of Comm'rs, 380 F.2d 955 (6 Cir. 1967 and Deal v. Cincinnati Bd. of Education, 369 F.2d 55 (6 Cir. 1966). However, in *Monroe*, despite dictum to the contrary, the Circuit Court *held:*

"Whatever *Bradley's* clear language, we cannot read it otherwise than as forbidding laissez faire handling of faculty desegregation. It implies that the accomplishment of that goal cannot be left to the free choice of the teachers and that the Board must exercise its authority in making faculty assignments so as to assist in bringing to fruition the predicted benefits of school desegregation. * * * It is sufficient for us to say now that the formula announced by the District Judge, leaving the decision of integration of the faculties to the voluntary choice of the teachers, does not obey current judicial commands." 380 F.2d 955, 960–961.

15. The plan provides:
"Race or color is not and shall not be a factor in the hiring, assignment, reassignment, salary, promotion, demotion or dismissal of teachers and other staff members, including bus drivers. Teachers and other professional staff may not be dismissed, demoted, or passed over for retention, promotion or rehiring on the ground of race or color.

"Vacancies on the teaching and professional staff will be filled by employment of the best qualified available applicant, without regard to race or color of the teacher or of the students.

"The pattern of assignment of teachers and other professional staff among

the various schools of the system will be without regard to race, color or national origin, and will be such that teachers or other professional staff of a particular race are not concentrated in those schools where all, or a majority, of the students are of that race.

"In the 1967–68 school year and each year thereafter, to the extent positions and qualified personnel are available, the district will assign a significant portion of the teachers and professional staff of each race to schools in the system where their race is a minority. A report will be filed with the Court not later than October 1, 1967, and no later than October 1 of each subsequent year, setting forth the exact assignments made."

16. By way of significant comparison we note that the Board's first sentence is identical to that required in the Fifth Circuit but it then omits the additional commitment which reads:

"[E]xcept that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty." United States v. Jefferson Co. Bd. of Education, 380 F.2d 385, 394 (5 Cir. 1967).

placement in Smith v. Board of Educ. of Morrilton School Dist. No. 32, quoted with approval our early statement in Dove v. Parham, 282 F.2d 256, 258 (8 Cir. 1960) by saying:

"The Board's stated * * * policy must give way if the result of its use is a deprivation of constitutional rights. Cf. Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958). In Dove v. Parham, 282 F.2d 256, 258 (8 Cir. 1960), we said:

" 'Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights.' " 365 F.2d at 777.

The present plan as filed envisages both (1) filling vacancies and (2) assignment of staff. These are positive steps by which faculty desegregation can take place, and represent an adequate statement of intent. The "good faith" test must await their results.

However, this amended plan was not filed until June 1967. There can be no doubt that the faculty desegregation contemplated is two years late under this Court's mandate in *Kemp I*. Instead of just seeing the start of faculty desegregation, we had every reason to expect that the transition would be complete in 1967–68.

▮▮▮▮ Appellants have therefore asked for injunctive relief for the Spring semester of 1968. This Court advanced this case on its appellate docket to consider this request. Although we are not unsympathetic to appellants' plea,[17] we feel it would be too disruptive of the educational process to require affirmative action in the middle of the school year. We ask, however, that appellees submit to the District Court by August 1 of this year the number of Board assignments to be made in each school for the school term 1968–69. These assignments shall effectuate, satisfactorily to the District Court, the measure of racial balance necessary to be in substantial compliance with our ruling here.

We now briefly address ourselves to the meaning of "racial balance." Argument is strenuously repeated that assignment by race completely disregards the standards of qualification of the teacher-applicant. In the face of our prior holdings, this contention only raises argument for argument's sake. Surely all recognize that quality of education for any student depends on many factors, not the least of which is the competence of his teacher. We reaffirm the principle that faculty selection must remain for the broad and sensitive expertise of the School Board and its officials. However, refusal to transfer or assign white staff to minority schools or Negro staff to majority classrooms cannot be justified on the argument that educational standards would thereby be lowered. Any teacher qualified to teach white children ought to be competent to teach Negroes and vice-versa. We are concerned with standards of equal education for all students—whether they be white or Negro. The argument for providing superior education for either race alone does not attract or persuade us.

"Racial balance" can perhaps be measured more adequately by what it is not than by definition of what it is.[18] It is not (1) a segregated Negro high school with an all Negro faculty, (2) nor is it an all Negro junior high school and four elementary schools with an all Negro

---

17. There are approximately 80 Negro and 250 white teachers in the school system. The evidence reflects there are approximately 40 teachers a year who either resign or retire. There were 43 in 1965–66. Yet in 1966–67 no vacancies were filled to shift the racial balance. In 1967–

68 three of the Negroes placed in predominantly white schools were new and three were previously in the system.

18. The late Professor Cahn wrote that justice is best defined by considering what injustice is. Cahn, Confronting Injustice 10 (1966).

faculty, (3) nor is it an all white faculty in predominantly all white schools, (4) nor is it the assignment of one Negro teacher to school staffs composed of a dozen to twenty white teachers, (5) nor 2.4% of the school system's white faculty assigned to three of the seven minority schools.[19]

What then may be said to be that measure of racial balance necessary to meet constitutional standards? It is misleading to think that "balance" means exact symmetry or equilibrium of the races. Numerical quotas or percentages, although appealing for their simplicity, lack that equitable flexibility which is still needed for a selective distribution of qualified teachers for particular faculty roles.[20] But it misses the constitutional mark to say that this principle of flexibility then justifies a segregated faculty pattern. Both extremes overlook the derivation of the rights involved. We are dealing with the equal protection clause as it affects the overall educational process. The question thus becomes, when is there such faculty distribution as to provide equal opportunities to all students and to all teachers—whether white or Negro? Students in each school should have the same quality of instruction as in any other school. Every predominantly Negro school should have wherever possible, substantially as integrated a faculty as the predominantly white school. Involved is the basis principle that instruction for both white and Negro should include the opportunity for equal educational experiences. Obviously, the democratic ideal of equality of opportunity cannot be nurtured in a segregated environment.

The court's role in striking a racial balance of faculty is not the perplexing judicial task normally faced in the ordinary resolution of conflicting claims. Here there no longer exist conflicting interests between the parties. Their goal must be the same: a wholly desegregated school system. *When the predominant race of the students attending a particular school continues to serve as the predicate for the Board assignment of a teacher,* then equal opportunity is denied. *If a predominantly Negro faculty continues to create a pervasive influence on the students' choice of school,* then equal opportunity is denied. It is the simple recognition that all students and teachers must be treated alike. This guaranty has always been aimed at undue favor or class privilege. Thus, the real determinant of racial balance becomes only the measurable application of equal protection of the law. Appraisal of conformity to this principle is not new and should not be difficult within the judicial process.

In conclusion we hold: (1) that serious consideration should be given by the School Board and the District Court to a more positive program to eliminate segregation in all of the schools within the El Dorado school system;[21] (2)

19. "Numbers and per se are not the ultimate answer but, up to a point, they touch upon realities." Yarbrough v. Hulbert-West Memphis School District, 380 F.2d at 969.

20. E. g., in a school having three Negro and seven white teachers with two vacancies to fill, qualified teachers of either race should not be turned away merely to comply with a 33⅓% quota of Negro teachers. As Mr. Justice Holmes once said: "The passion for equality sometimes leads to hollow formulas * * *." Postal Telegraph Cable Co. v. Tonopah & T. R. R., 248 U.S. 471, 475, 39 S.Ct. 162, 164, 63 L.Ed. 365 (1919).

21. H.E.W. guidelines are here again suggestive:
 "§ 181.11 Various Types of Desegregation Plans
 "It is the responsibility of a school system to adopt and implement a desegregation plan which will eliminate the dual school system and all other forms of discrimination as expeditiously as possible. No single type of plan is appropriate for all school systems. In some cases, the most expeditious means of desegregation is to close the schools originally established for students of one race, particularly where they are small and inadequate, and to assign all the students and teachers to desegre-

that the Court's decree be modified to provide the same adequate notice for all grades as to the right to exercise choice to change schools; (3) that in the event the freedom of choice plan is continued, serious consideration should be given by the School Board and the District Court toward removal of all obstacles for its success. Strongly recommended is adoption of the H.E.W. guidelines relating to annual choice for *all* students *or* some other practical means to speed the desegregation process; (4) that the Court's decree be modified to require the School Board to make a positive commitment to desegregate the faculty in each school in conformity with our opinion herein; (see H.E.W. guidelines p. 20, supra) and (5) a supplemental report be filed with the District Court setting forth details for faculty desegregation to achieve substantial racial balance within the staff of each school commencing with the school year 1968–69. This report is to be filed in accordance with a date to be set by the District Court but in no event later than August 1, 1968.[22] Complete faculty desegregation to be accomplished by the school term of 1969–70, and a similar report in this regard shall be filed in accordance with the District Court's order.

Our opinion is in no way intended to preclude either party from further evidentiary hearings if deemed necessary for proper implementation of the plan. Nor do we order it. In fact, if the parties will accept this Court's opinion in the spirit in which it is intended, no further evidentiary hearings should be necessary, unless the Court desires further information for implementing a more effective program. Pointing toward a more cooperative atmosphere and in balancing all circumstances, we deny appellants' request for attorney fees at this time.

This case is remanded to the continuing jurisdiction of the District Court in conformity with this opinion.

gated schools. Another appropriate method is to reorganize the grade structure of schools originally established for students of different races so that these schools are fully utilized, on a desegregated basis, although each school contains fewer grades. In some cases desegregation is accomplished by the establishment of non-racial attendance zones. Under certain conditions, a plan based on free choice of school may be a way to undertake desegregation. In certain cases the purposes of Title VI may be most expeditiously accomplished by a plan applying two or more of the foregoing procedures to certain schools or different grade levels." 45 C.F.R. 181.11 (1967).

22. The District Court may determine that an earlier date will be more desirable, based upon the time in which teacher contracts are completed and vacancies determined and filled.