**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MANSION HOUSE CENTER MANAGE-MENT CORPORATION, Respondent.**

**No. 71–1644.**

United States Court of Appeals Eighth Circuit.

Submitted June 15, 1972.

Decided Sept. 14, 1972.

Supplemental Opinion Filed Feb. 12, 1973.

Harold Kaufman, Atty., N. L. R. B., Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N. L. R. B., Washington, D. C., for petitioner.

Peter J. Wunderlich, Lashly & Neun, St. Louis, Mo., for respondent.

Before LAY, HEANEY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

The Board seeks enforcement of its order against Mansion House Center Management Corporation (hereinafter Mansion House) arising from its affirmance of a trial examiner's finding that the respondent violated §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act. The Board ordered, inter alia, reinstatement including back pay to eight painting employees, and the company was ordered to bargain collectively. Mansion House basically challenges the Board's order on the grounds that (1) there exists no substantial evidence on the record as a whole to support the 8(a)(3) violations, and (2) the issuance of the bargaining order was improper.

We find substantial evidence on the record as a whole to support the Board's finding of 8(a)(3) violations. The Board's order for reinstatement of the employees and for back pay is enforced. We retain jurisdiction as to the 8(a)(5) violation pending further briefing by the parties.

The facts may be briefly recited.

The Mansion House manages a residential and office building complex in St. Louis, Missouri. Prior to December 1969, it employed a painting contractor to do its inside painting. Normally, the company hired its own painters to do any outside painting which was necessary. However, in December 1969, the painting contractor became ill, and the company assumed sole control of all the painting. As of February 1970, Mansion House had two painters on its payroll. Five more painters were hired on or before June 1, with the last painter employed on June 3.

On June 1, at the invitation of one of the employees, the business representative of the union (Painters Local 115), a Mr. Raftery, met with five of the painters to discuss joining the union in order to help resolve difficulties the painters were having with the company over holiday pay and differences in wages and vacations. At this meeting the five painters who were present signed authorization cards. The following day, June 2, two more painters' signatures were acquired.[1]

On the morning of June 2, Raftery met with Mr. Lashly, the company's president, and presented him with a letter containing (1) the union's claim to representation of a majority of the company's painters (i. e., five of the eight painters signed June 1); (2) the union's request for recognition; and (3) a request to schedule a date for collective bargaining negotiations. In addition, Raftery handed Lashly a recognition agreement form which Lashly refused to sign.[2]

Lashly and Raftery then scheduled another meeting for one week later, June 10. Between June 2 and June 10 the company discharged five painters: two on June 3; one on June 4; and two on June 8. The latter two painters had been hired just one week earlier, and there is evidence indicating they were told their work would last at least three to four months.

At the June 10 meeting Raftery again requested that Lashly sign the recognition agreement, but Lashly again refused saying that he would go to the Supreme Court before the union would get any recognition. Following that meeting, the three remaining painters were discharged on June 12.

The company argues that the Board's finding of illegal § 8(a)(3) discharges was based on mere "suspicion" arising from the timing of the discharges and lay-offs subsequent to the union's demand for recognition. N. L. R. B. v. Superior Sales, Inc., 366 F.2d 229, 233 (8 Cir. 1966).

The trial examiner found elements of union animus and implausible company explanations in addition to the "timing."

---

1. The eighth painter, hired on June 3, never signed an authorization card nor did he testify at the hearing.

2. According to Raftery's testimony:
"I asked him [Lashly] would he sign it, he said, 'You know better than that, I won't sign anything like that. You come in here without an appointment or advance notice and try to strong-arm me into signing an agreement,' and I at that time tried to assure him that we weren't trying to strong-arm him, we would be happy to set up a meeting with him at his convenience, to go over these things, and he told me that if I wanted to fight he would give me a fight, that if I got one step out of line he would cut my throat and that several times he accused me of trying to strong-arm him into having an agreement, and he says even when he makes appointments with important people like the Mayor and people in that nature, he has to get appointments to see him. So I asked him if he would be agreeable to setting up an appointment with me and having a meeting at that time, and on that note he said he would have his secretary call me. And at that time I left."

See McGraw-Edison Co. v. N. L. R. B., 419 F.2d 67, 75 (8 Cir. 1969). The record amply supports this finding.

The company denies that any inference of illegal motive can be sustained from the synchronism of the discharges and union activity since the company "at no time prior to their separation from employment, had knowledge of union activity by any of the eight alleged discriminatees." (Respondent's Brief at 24.) Such a statement is myopic indeed, since on June 2 Lashly was personally informed of the union activity by Raftery and the discharges began the following day, June 3. The company claims that it had no knowledge on June 2 since Raftery did not show Lashly the authorization cards or any other physical proof. Such a contention is untenable in light of N. L. R. B. v. Regal Aluminum, Inc., 436 F.2d 525, 527 (8 Cir. 1971), where this court, in the context of an 8(a)(5) discussion, indicated that "knowledge" of a union's recognition demand can be found through surrounding facts and circumstances and the company's general awareness of a union demand. No greater degree of knowledge would seem required for 8(a)(3) knowledge of "union activity."

The language noted *supra* in regard to what Lashly told Raftery (e. g., "cut your throat"—"want to fight" etc.) clearly indicates Lashly's hostility towards the union, when Lashly testified he denied ever having made such statements. However, in weighing the credibility, the trial examiner credited Raftery's testimony saying:

"I reach this result on the basis of my observations of the demeanor of both witnesses while testifying, and because, after considering the entirety of the testimony of each of these witnesses in the light of the record as a whole, there are various particulars in which I regard the testimony of Lashly as implausible whereas Raftery's testimony does not create similar doubts."

It is settled law that the question of credibility of witnesses is primarily one for determination by the trier of facts. N. L. R. B. v. Penzel Construction Co., 449 F.2d 148, 149 (8 Cir. 1971).

The company further attempts to justify the discharges as being based on legitimate business considerations. Lashly testified that the discharged painters had done substandard work and because of this the company decided to return to a painting contractor for its painting maintenance. Lashly testified that the painting contractor was contacted in May prior to any union activity among the company's employees. Consequently, he maintains the painters were discharged in favor of an independent painting contractor (a purely valid business decision) and not pursuant to any union animus.

However, the testimony of the painting contractor, one Chamness, impeached Lashly's testimony. Chamness testified that he did not initially meet with Lashly until mid-June—well after most of the employees had already been discharged. The trial examiner found the testimony of Chamness more creditable. The trial examiner's doubts as to Lashly's testimony would carry over to any judicial review since there exists no "extraordinary circumstances" requiring this court to reverse the trial examiner's treatment of the testimony.

Furthermore, although the company argues that all the painters were discharged for cause, the testimony is conflicting. For example:

(1) Mrs. Gaddy, the company employee who supervised the painters, testified that Fath was discharged for his messy work; yet, the evidence reveals that Fath and Brown worked together and it would be exceedingly difficult to determine which painter was sloppy. Moreover, when Brown was discharged, Mrs. Gaddy did not mention sloppiness as the cause as she had done with Fath.

(2) Himmaugh was hired about June 1 and Dunham on June 3. When hired,

there is evidence indicating that they were told the work would last three–four months. Yet, both were discharged within one week—the company claiming that their temporary work was completed.

However, several painters testified that there was more painting to be done. This testimony is buttressed by the fact that in mid-May the company had ordered 200 gallons of paint and after the painters were discharged over 160 gallons still remained. This does not indicate that all the planned painting had in fact been completed.

For the above reasons the record reveals substantial evidence on the record as a whole to support the Board's finding of 8(a)(3) violations.

The Board's order is enforced as to the 8(a)(3) violations; this court retains jurisdiction as to the 8(a)(5) violations pending further briefing.