Brenda **SHERPELL, et al., Plaintiffs,**

v.

The **HUMNOKE SCHOOL DISTRICT NO. 5 OF LONOKE COUNTY, ARKANSAS, et al., Defendants.**

No. LR–C–84–191.

United States District Court, E.D. Arkansas, W.D.

Sept. 30, 1985.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

John W. Walker, Little Rock, Ark., for plaintiffs.

G. Ross Smith, Dan F. Bufford, Laser, Sharp & Mayes, P.A., Little Rock, Ark., for defendants Weaver and Eads.

## MEMORANDUM OPINION

GEORGE HOWARD, Jr., District Judge.

This civil rights action was instituted on February 24, 1984, by Brenda Sherpell, as parent and next friend of Clyde Sherpell; Easter Bell, as parent and next friend of Malinda Bell; Katherine Ranor, as parent and next friend of Marcie Ranor; Ethel Criss, as parent and next friend of Michael Criss; and Joe Bryant, as parent and next friend of Patrick Bryant, against The Humnoke School District No. 5 of Lonoke County, Arkansas; Leroy Isabell, Individually and as President of The Humnoke School Board; Tom Camp, Tommy Jones, Lillian Calvert and Elbert Carter, Individually and as Members of The Humnoke Public School Board; Edso Weaver, Individually and as Superintendent of The Humnoke Public School Board; and Charles Eads, Individually and as Principal of The Humnoke High School, seeking a declaratory judgment pertaining to policies and practices adopted and implemented by the defendants in the operation of the public schools within The Humnoke School District No. 5, which purportedly discriminate against both adult and minor plaintiffs because of their race and color. Plaintiffs also seek injunctive relief to the end that defendants be enjoined from implementing and enforcing such policies and practices, as well as damages against the defendants.

The jurisdiction of this Court is invoked under Title 28 U.S.C. § 1343 and Title 42 U.S.C. §§ 1983 and 1985. Plaintiffs also assert, as additional jurisdictional grounds, the Sixth and Fourteenth Amendments and Federal Common Law. Plaintiffs also invoke this Court's pendent jurisdiction in order to assert certain Arkansas state common law rules in order to assert claims for assault and battery, defamation, intentional infliction of emotional distress, false imprisonment and unlawful restraint.

This proceeding was instituted as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) in behalf of plaintiffs and other blacks similarly situated in The Humnoke School District No. 5. Spe-

cifically, plaintiffs, as asserted in their motion for class certification, sought to represent a class of persons comprised of "all black students and prospective and future black students, faculty and staff of The Humnoke School District No. 5 of Lonoke County."

On December 14, 1984, this Court entered its order denying plaintiffs' motion for class certification and holding that'this action would proceed as an individual action since plaintiffs' motion and supporting documents failed to designate any definite number of persons constituting the purported class. Moreover, plaintiffs conceded that they were unable to "identify the class size with specificity, but believed, upon information, that these persons were so numerous that joinder of all members is impractical." The Court concluded that such conclusory allegations were insufficient to demonstrate that the class was so numerous that joinder of all members is impracticable, and that, moreover, the Court would be required to indulge in conjecture and speculation as to the size of the class and whether the requirement of numerosity under Rule 23(a) and (b) had been met.

On March 15, 1985, the Court denied plaintiffs' motion for reconsideration after the Court considered additional evidence in support of plaintiffs' request for class certification.

Plaintiffs in their post trial brief have again pressed for a certification of a class by asserting:

"The number of persons affected by defendants' constitutional violations would not only include those black students and faculty who are presently connected with the school district, but due to the school district's history of racial discrimination would include *all past and prospective black students, faculty and staff*. Clearly, the number of persons comprising such a class is so large as to make individual lawsuits impractical." (Emphasis added).

■ Plaintiffs, after trial on the merits, seek to include "all past ... black students, faculty and staff" in order to demonstrate that the purported class is so numerous that joinder of all members is impractical. The Court is not persuaded that it should reconsider its denial of plaintiffs' request for class certification for two essential reasons: first, plaintiffs have simply asserted conclusory allegations as opposed to factual ones and, second, the likelihood of unfair prejudice to defendants should the Court certify a class after a full scale hearing on the merits. Further, the Court is still of the view that the Court would be required to speculate as to the size of the purported class and whether the requirement of numerosity has been met. Accordingly, plaintiffs' request is denied.

## I.

### BACKGROUND INFORMATION

Prior to 1968, the public schools in the Humnoke School District were operated under the separate, but equal concept in which all white students attended the all-white school in Humnoke, Arkansas, and all blacks attended the all-black school in Allport, Arkansas. The geographical area, consisting of approximately sixty square miles, constituting Humnoke School District is essentially a rural farming community in southeastern Arkansas.

The accommodations provided by the district to the black school were less than equal to the accommodations afforded the white school. For example, there was a lower teacher-pupil ratio at the all-white school than the black school[1]; the white students were afforded a full educational

---

[1] In January, 1968, the student enrollment and the number of teachers in Humnoke Elementary School (the all-white school) and the G. W. Carver Elementary School (the black school) were as follows:

| GRADE | HUMNOKE ELEMENTARY | NO. OF TEACHERS | GW CARVER ELEMENTARY | NO. OF TEACHERS |
|---|---|---|---|---|
| 1 | 19 | 1 | 26 | 1 |
| 2 | 20 | 1 | 25 | 1 |
| 3 | 13 | 1 | 19 | 1 |
| 4 | 14 | 1 | 17 | 1 |
| 5 | 21 | 1 | 18) | |
| 6 | 18 | 1 | 29) | 1 |
| TOTAL | 105 | 6 | 129 | 5 |

program while black students beyond the sixth grade level at the Allport School were transported out of the district to Stuttgart or England, Arkansas, in adjoining districts. The teaching materials made available to the all-black school were so deteriorated and mutilated that these materials were virtually without any benefit or usefulness. The situation was so deplorable that black teachers at the Allport School demanded better teaching materials and advised the school officials that a failure on the part of the district to respond favorably to this request would result in mass resignation from their teaching positions.[2] The all-white school board while ignoring the remedial demands of the black teachers, construed the letter as a positive and absolute resignation, accepted the black teachers' resignations without conducting a hearing. In short, the Allport School was more separate than it was equal when compared to the Humnoke School.

In 1968, the all-black school was closed and the black students were transferred to the Humnoke Schools. Blacks were not afforded the opportunity to participate in the alleged unitizing of the Humnoke District. Only two black faculty members were retained for teaching purposes in the Humnoke Schools.[3] These two black teachers were given all black or segregated classes in the new purportedly unitary school system.

2. The following is a reproduction of a letter sent to the Humnoke School Board by the black teachers at the all-black school on December 11, 1967:

Mr. Billy P. Boyle, Superintendent of Schools
Humnoke High School
Humnoke, Arkansas
Dear Sir:
    Due to conditions at G.W. Carver, we request that the following changes be made:
    1. We must have a full time principal.
    2. We must have adequate school supplies.
    3. Give to us a complete faculty staff.
    The lack of Federal Aid, at G.W. Carver School, with reference to the Free Lunch Program, Medical and Dental Care and Clothing must become effective. Teacher's Aids namely: Remedial Reading, Speech Therapist, and Special Education.
    Improvement of the following must occur: Health conditions, namely, improper sewage and inadequate walkways.

An intense racial atmosphere has permeated the Humnoke School System since the closing of the Allport black school and the transfer of the black students to the Humnoke Schools in 1968. This atmosphere is generated and perpetuated by the use of racial slurs and jokes, and the existence of a dual system premised on race within the Humnoke School System. This acute atmosphere has had a deleterious effect on black students which has resulted in not only creating an inferiority complex on the part of black students, but has served as a potent force in impeding and frustrating black students ability to learn and strive for excellence.

The evidence reflects that faculty members refer to black students as "niggers", "blue-gums", and "coon". White patrons of the Humnoke School District over the years have been afforded the opportunity and privilege to use the school facilities after school hours, during the week, and on week-ends for civic or community projects and programs, but black patrons are not afforded the same opportunity and privilege.

Basketball goals established on the Humnoke School campus for recreational purposes were removed from the campus at the direction of the Humnoke School Board in order to keep blacks out of the Humnoke community after normal school hours.[4]

If the above mentioned changes cannot be met by the end of the *First Semester* ending January 1968. [We] ask to be released from [our] contract[s] as of that date.
                    Respectfully yours,
The following is the Board's reply:
The Board of Directors of the Humnoke School District # 5 met on December 14, 1967, to consider the matter of your letter of resignation of December 11, 1967.
It was the decision of all members of the Board to accept your resignation effective January 19, 1968.
                    Respectfully yours,

3. During the 1966–67 school term there were nine black teachers employed at the black school.

4. The Humnoke Community is practically all white and the Allport community, which is located approximately two miles from the Hum-

A board member, who had not planned to seek reelection to the Humnoke school board, stated that he would run reluctantly for reelection in order to keep "niggers" from being elected to the school board.

Although the student body in the district is approximately 60% white and 40% black, prior to the filing of this lawsuit, there was only one black teacher who taught a regular course and approximately three black teachers who were instructors in special education courses; there are five white cafeteria workers in the system and only one black; there are four white bus drivers and only one black driver.

Mrs. Jackie Martin, a former white teacher who taught in the Humnoke School System for nine years, testified that she personally witnessed the discipline of a black child by an administrative official which resulted in broken skin and blood; that during this nine-year tenure, she had not witnessed any white child subjected to such treatment.

Black patrons of the district are not encouraged to present group or individual problems to the school board formally, but are required to consult and communicate with a particular board member on any grievances on a one-to-one basis.

Joe Bryant, a plaintiff in this action, testified that his father, to his personal shame, was the one black person in Humnoke whom whites could call upon to appease and calm the demands and aspirations of blacks who persisted in change. In return, according to Mr. Bryant, his father received favored treatment economically by the white leaders of Humnoke.

The one glimmer of hope flowing from the evidence in this record is the fact that white student leaders were not committed to, nor influenced to any measurable degree by the racial practices of faculty members and administrators particularly in situations in which the student body had exclusive control, i.e., class organizations and in the selection of materials to be included in the year book. Black students were included or involved without restriction in extra curricular activities fostered by the student body. Simply put, the adults could achieve tremendous success in resolving problems in the Humnoke School System if they would only pattern their attitudes and conduct after the students in the district.

## II.

### RACIAL ALLOCATION OF FACULTY

The evidence reflects that when the all-black school was closed in 1968, only two black faculty members were retained for teaching purposes in the purportedly unitary Humnoke School System. Between 1971 and 1975 only white teachers were employed by the District. Between 1968 and the 1980–81 school term, not more than four black teachers have been employed at any given time.[5]

There are no blacks serving at the administrative level. As previously noted, with exception to one black cafeteria worker and one black bus driver, all custodial, secretarial, transportation and food service personnel are white.

Black male applicants have sought coaching positions in the District, but were not hired because the Board and administrators were reluctant to have a male figure supervising girls. However, the District employed a white male to fill the vacancy.

The principal and several white faculty members in the District are not certified. The current superintendent was certified only recently. Moreover, the Board of Directors was unaware of this lack of certification. There are no uncertified black teachers employed by the District.

---

noke Community, is essentially all black. The Humnoke School District has a population of 1,151 and 55.4% of that number is white and 44.6% is black. The District has one elementary school and one secondary school.

**5.** Pursuant to leave of the Court following the trial of this case, the District hired one black teacher for the 1985–86 school year and approximately one other black teacher was employed during the pendency of this lawsuit.

The evidence further reflects that the District does not have objective and nondiscriminatory standards for hiring, promotion or dismissal. While the District maintains a recruitment program conducted primarily at all white or predominantly white institutions, notices of vacancies and the filling of these vacancies are implemented by word of mouth or on the recommendations of friends and family ties.

As previously observed, the black student population of the District is essentially 40% of the total student population.

From the outset of these proceedings, plaintiffs have challenged defendants' policy and practice of allocating faculty and support staff on a racial basis. It is plain that plaintiffs have standing to make this challenge. *Rogers v. Paul,* 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265; *Bradley v. School Board of the City of Richmond,* 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; *Kemp v. Beasley,* 389 F.2d 178 (8th Cir. 1968).

Seventeen years ago Judge Lay, now Chief Judge, speaking for the Court of Appeals in *Kemp v. Beasley, supra,* in emphasizing the obligation of school officials observed:

There must be positive recognition by school officials of their responsibility to create a nondiscriminatory school system.

It is plain from this record that defendants, thirty-one years after the Supreme Court handed down *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and seventeen years following the closing of the all-black school, have not only failed to achieve a nondiscriminatory school system, but have failed to recognize the "positive" duty imposed on them to do so. Accordingly, the Court is persuaded that defendants must be required to take immediate affirmative steps to correct the racial allocation of faculty in order to achieve a unitary school system. In this regard, the Board of Directors shall:

1. Within thirty days from the date of this opinion and order establish a bi-racial committee in the Humnoke School District consisting of a cross section representation from the black and white communities.

2. The Board shall, subject to the participation of the bi-racial committee and this Court's approval, establish objective nondiscriminatory standards for recruitment, hiring, promotion, dismissal and salary schedule of faculty and staff personnel of the Humnoke School District.

3. The Board shall, subject to the participation on the part of the bi-racial committee and approval of the Court, devise a plan to achieve racial balance of the faculty on or before January 15, 1986.

### ASSERTIVE DISCIPLINE

Assertive discipline is a new discipline concept designed to enable classroom teachers to cope with student behavior problems by equipping teachers and administrators with the skills and confidence essential in establishing and maintaining a classroom atmosphere conducive to education which is beneficial to both the teacher and student. In essence, the concept recommends guidelines that will maximize the teachers' opportunity to teach and each student's opportunity to learn.

The key to a successful assertive discipline program is the ability of the teacher to provide a negative consequence each time a student's behavior is inappropriate on the one hand and the ability to invoke effective positive reenforcement to appropriate behavior on the other hand.

This new discipline concept has been received with enthusiasm by educators nationwide since assertive discipline was first advocated in the 1970's.

The Humnoke School District, in an effort to cope with the student behavior problems and maximize the opportunity for learning, adopted the assertive discipline concept during 1982.

Humnoke's assertive discipline procedure constitutes, essentially, "six basic school wide rules" in which all students must adhere to, and not more than "two classroom rules" adopted by individual teachers in

which students are expected to follow during any particular class session. Students are expected to be knowledgeable of these eight rules. Of course, if a student has more than one teacher to report to, the number of rules for that student to cope with in the course of a day will depend on the variation of one teacher's individual rules from the next teacher's individual rules. There are no uniform standards or guidelines that teachers are required to consider in formulating individual classroom rules.

The six basic "district rules" are:

"1. Be in your assigned seat and ready to work before the bell begins to ring;

2. Bring paper, pencil, books, or necessary items and complete assignments every day. (Any overnight assignment is a completed assignment.);

3. Keep hands, feet, books and objects to yourself and keep feet off the desk or any other object except the floor;

4. No swearing, *cruel teasing, rude jestures, or put downs;*

5. Follow teachers (sic) directions;

6. Each teacher has no more than two classroom rules of his or her own. (These must be turned in and approved by the principal before they be inforced (sic)." (Emphasis Added)

A failure to conform to any of the above designated rules will automatically result in the imposition of a negative consequence by either the teacher involved or the principal. The following are negative consequences that may be imposed for a violation of "district rules" which are also characterized as "non-severe district rules": the first offense requires a verbal warning; the second offense imposes a duty on the teacher to conference with the student and requires the imposition of noon detention; the third offense results in teacher-student-parent conference plus an after school detention; the fourth offense requires the imposition of corporal punishment administered by the teacher involved; the fifth offense may result in suspension from school; and the sixth offense requires, at

the principal's discretion, either minimum corporal punishment, or a recommendation that the student be expelled from school.

Rewards to those students who have not been involved in any behavior problems have been characterized as positive consequences "for non-violation of district rules." For those students who have no behavior problems on a monthly time frame, such students are entitled to leave their respective classrooms for the cafeteria before the rest of the students are dismissed for the lunch period. Those students who have not violated any district rule during a nine-week period are recognized in the local newspaper and will receive recognition from within the school. Students who have not caused any problems during the semester will be granted one excused absence from school on a day of the student's choice with approval of the parents.

Humnoke's assertive discipline procedure also provides for a set of rules characterized as "severe clause rules" which requires a student to report directly to the principal for imposition of punishment when there is a violation of any of these rules. The "severe clause rules" are:

"1. If a student uses vulgar or profane language, he or she will be severed;

2. If a student commits or attempts to commit physical harm to another student or adult, he or she will be severed;

3. If a student destroys or takes school property, he or she will be severed;

4. *If a student engages in rude or disrespectful behavior toward staff members, he or she will be severed;*

5. If a student has drugs or is under the influence of drugs or alcoholic beverages, he or she will be severed;

6. If a student intentionally lies to a faculty member, he or she will be severed;

7. If a student is caught with tobacco in his or her mouth, he or she will be severed;

8. *If a student causes unusual circumstances to occur which is not covered above, he or she may be severed."* (Emphasis Added)

Plaintiffs argue that Humnoke's assertive discipline procedure should be declared unconstitutional and defendants enjoined from employing assertive discipline because the concept has been implemented with an uneven hand at the expense of black students because of their race. While the Court is not persuaded that Humnoke School District should be enjoined from making use of the assertive discipline concept, or that assertive discipline is unworkable, the Court is convinced that the subjective elements of defendants' assertive discipline procedure are responsible, in a large degree, for the frustration that has resulted in defendants' efforts to implement assertive discipline. For example, each teacher in the Humnoke School System is entitled to establish not more than two rules of his or her own to supplement the district's rules. There are no uniform or definite standards established by the district to assist the teachers in achieving uniformity, objectivity, and a concensus. One teacher may require a student to get permission, by simply raising his hand, before departing for the bathroom during a class session, while another teacher may simply require the student to depart, without permission, so long as the departure is not disruptive in any way. Further, district rules preclude, among other things, "cruel teasing", "rude jestures" and "put-downs". In the absence of clear and objective guidelines formulated by the school district, each teacher is free to decide what constitutes "put-downs", "cruel teasing" or "causes unusual circumstances to occur." In short, a student may be punished or given a negative consequence for an act committed during the 9:00 a.m. o'clock class period while, on the other hand, such conduct may be quite legitimate and regarded as appropriate before another teacher during the 10:00 a.m. o'clock class period.

Because of the subjective elements in defendants' assertive discipline procedure,

those teachers and administrative personnel who possess the disposition to use assertive discipline to shield any racial bias in imposing a discipline against a black child, when in fact there may be insufficient reasons, or no reason at all to discipline the child, assertive discipline currently affords a protective cover for such unconstitutional conduct. Consequently, black students are disciplined for certain behavior while similarly situated white students are not. The Court is persuaded that defendants should be required to revise their assertive discipline procedure to the end that all subjective criteria be removed; and that uniform and objective guidelines be established to eliminate the opportunity to administer discipline on an uneven handed basis. Further, the bi-racial committee to be established, pursuant to this Court's order, should be afforded input in the revision of the district's assertive discipline procedure.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs contend that defendants have intentionally inflicted emotional distress upon plaintiffs, in particular, and blacks, in general, in the Humnoke School District, by imposition of corporal punishment without cause and the use of racial slurs in referring to black students.

This claim for relief stems from the pendent state-law claim encompassed in plaintiffs' complaint seeking foremost to vindicate their federal basic and fundamental constitutional right to a unitary education free of the stigma and badge of racism.

In *M.B.M. Co. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980), the Arkansas Supreme Court, in what may be characterized as a precedent setting decision, abandoned its requirement that there must be a theoretical or actual physical injury or impact in order to warrant an award of damages for mental anguish. The Supreme Court observed:

[W]e can and do now recognize that one who by extreme and outrageous conduct wilfully or wantonly causes severe

emotional distress to another is subject to liability for such emotional distress and for bodily harm, resulting from the distress.

The Supreme Court in defining extreme and outrageous conduct stated:

[W]e mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bonds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

The Court is persuaded that the use of such terms as "niggers", "blue-gums" and "coon" in referring to black students by individuals who are endowed with the responsibility to educate and prepare the young to become useful citizens in a free and competitive society, is, indeed, encompassed in the Arkansas Supreme Court's definition of the terms extreme and outrageous conduct. However, the difficulty confronting the Court in this case is the deficiency of the evidence demonstrating that the emotional distress sustained by plaintiffs is *"so severe"* resulting in *"bodily harm"*. There is absolutely no medical evidence or any credible evidence, as a matter of fact, in this record to justify this Court in awarding any damages on this claim for relief. It is true that Mrs. Martin, a former teacher in the Humnoke District, testified that she witnessed the discipline of a black child which resulted in "broken skin and blood", but the record is deficient as to the identity of the child involved and other relevant matters in order to avoid speculation and conjecture either in determining the degree and nature, whether physical or mental, of the bodily harm sustained, or the amount of damages to be awarded in terms of reasonableness.[6]

In other words, the Court holds that plaintiffs have failed to establish a *prima facie* case, by a preponderance of the evidence, that the emotional distress sustained by plaintiffs is "so severe" resulting in "bodily harm."

Relative to pendent state claim of minor plaintiff Clyde Sherpell, the Court finds that plaintiff has failed to establish a *prima facie* case, by a preponderance of the evidence, that minor plaintiff was beaten by Weston Woods to the extent minor plaintiff had "welts" on his buttocks. In other words, the Court holds that the evidence fails to demonstrate that the purported paddling was excessive, or imposed in an unreasonable manner and without good cause.

Ark.Stat.Ann. § 80–1629.2 (Repl.1980) provides in relevant part:

... Any teacher or school principal may use corporal punishment in a reasonable manner against any pupil for good cause in order to maintain discipline and order within the public schools....

## AT–LARGE ELECTION PROCEDURE CHALLENGE

■ The thrust of plaintiffs' claim for relief here is that black patrons of the Humnoke School District have less opportunity than whites in the District to participate effectively in school elections and to elect Board members of their choice. Thus, plaintiffs make a direct and frontal attack upon the electoral process for the election of the five school board members for the District.

Humnoke's electoral process is an at-large system whereby all eligible electors in the school district are entitled to vote annually to fill one position on a five member board for a term of five years. Candidates seeking to fill a vacancy are not required to reside in any particular section or zone within the district, but only required to be a resident of the district. The candidate receiving the highest number of votes on a district wide basis is designated winner.

---

**6.** The Court has also found that the racial atmosphere existing in the Humnoke Schools has resulted in an inferiority complex on the part of black students. But plaintiffs have failed to offer any credible evidence to enable the Court to find whether minor plaintiffs have sustained significant impairment to their personality traits.

Plaintiffs contend that Humnoke's at-large system is maintained by defendants for a discriminatory purpose—limiting the opportunity of blacks to participate effectively in the political process and to elect board members of their choice.

The evidence proffered by plaintiffs to establish this contention may be summarized as:

1.  Blacks constitute approximately 45% of the total population in the Humnoke School District, but no black has ever been elected to the Humnoke School Board because of polarized voting along racial lines. Moreover, a current board member who did not intend to run for reelection decided to run in order to keep "niggers" off the school board.

2.  There are no blacks serving in any administrative positions in the district, i.e., superintendent, principals, and assistant principals.

3.  Blacks are not welcomed at school board meetings and are urged to communicate with a designated board member on an one-to-one basis in order to register any grievances regarding school matters.

4.  Blacks are not afforded the opportunity to make use of school facilities after school hours and on week-ends as white patrons are. Basketball goals were removed from the school campus in order to keep black children out of the Humnoke community on the week-ends.

5.  During the 1966–67 school term, there were nine black teachers employed by the district to teach at the all-black school, but only two black teachers were transferred to the previously all-white school in January 1968, when the black school was closed. These two black teachers were required to teach segregated classes in the previously all-white school under the purported unitary system.

6.  Significantly, white faculty members and administrative personnel have referred to black students as "niggers", "blue-gums" and "coon" without any sanctions being imposed by the school board, although the superintendent, principal and certain board members were knowledgeable of the use of these derogatory terms.

7.  A substantial number of white faculty members, including the principal, have not been certified by the State Department of Education, but are permitted to teach, while black teachers currently teaching were required to be certified.

8.  The parent-teacher association was abolished by the Board of Directors following the closing of the all-black school and the transfer of the black students to the previous all-white school.

9.  While the Humnoke School District is only approximately sixty square miles in area, the District is divided into two separate distinct communities, one exclusively black identified as Allport which has a black Mayor and Town Council; and the other is Humnoke, with a white Mayor and Town Council. Because of the existence of deep-rooted racial discrimination over the years, any prospective black candidate cannot campaign effectively in the essentially all-white Humnoke Community.

10.  Black patrons of the Humnoke School District bear the effect of past discrimination in educational achievements, income and low socio-economic status. It is plain that the Board of Directors and their administrators have consistently put the interest of white patrons in the school district on a priority status.

From a totality of the evidence, direct and circumstantial, the Court holds that the Humnoke School District's at-large election system is unconstitutionally maintained for the discriminatory purpose and with the intent of limiting the opportunity of blacks to participate effectively in the political process, and in the election of board members of their choice as well as to prevent black candidates from being elected to the board.

Accordingly, the Court holds that the Humnoke School District should be enjoined from making use of the at-large

election procedure for election of school board members. The Court is persuaded, however, that a hearing should be scheduled in order to permit counsel and the parties to make recommendations as to the type of election plan that should be adopted to replace the district's at-large procedure. For example, should some of the board positions be filled on an at-large basis while some are filled on a district basis, or whether all positions should be filled on a district basis. In addition, the parties should also be permitted to recommend a target date for abolishing the current election procedure and the institution of a new one.

### III.

### CONCLUSIONS OF LAW

The following Conclusions of Law, insofar as they may be considered Findings of Fact, are so found by this Court to be true in all respects:

1. Plaintiffs have established a *prima facie* case of race discrimination, under both disparate treatment and disparate impact, by a preponderance of the evidence, under 42 U.S.C. §§ 1983, 1985 and the Fourteenth Amendment to the Federal Constitution on their claim of intentional and purposeful race discrimination relative to: (1) racial allocation of faculty; (2) assertive discipline; (3) intentional infliction of emotional distress; and (4) the use of the at-large election procedure for the election of school board members. Defendants have failed to demonstrate that their action was based on legitimate and nondiscriminatory grounds. However, assuming that defendants have shown legitimate and nondiscriminatory reasons for their action, plaintiffs have shown by a preponderance of the evidence that such action was pretextual to cover the purposeful and intentional racial conduct. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207; *Kenyatta v. Booker Packing Company*, 649 F.2d 552 (8th Cir. 1981); *Taylor v. Jones*, 653 F.2d 1193 (8th Cir.1981).

2. The defendants have a history of racial discrimination and do not operate a unitary school district under *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and its progeny.

3. The defendants have failed to develop objective, nondiscriminatory criteria in the hiring, retention, promotion and dismissal of faculty and staff in the Humnoke School District. *Clark v. Board of Education of Little Rock*, 449 F.2d 493 (8th Cir.1971); *Haney v. County Board of Education of Sevier County*, 429 F.2d 364 (8th Cir.1970); *Moore v. Board of Education of Chidester School District No. 59*, 448 F.2d 709 (8th Cir. 1971).

4. The defendants have failed to establish a racially balanced faculty to insure equality of opportunity, *Kemp v. Beasley*, 389 F.2d 178 (8th Cir.1968); *Kelly v. Altheimer, Arkansas Public School District*, 378 F.2d 483 (8th Cir. 1967); and a nondiscriminatory environment. *Rogers v. Paul*, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); *Bradley v. School Bd. of the City of Richmond, Va.*, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) and 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

5. Defendants have violated plaintiffs constitutional rights by subjecting them to a racially discriminatory environment through the use of racial slurs and stereotypes. *Taylor v. Jones*, 653 F.2d 1193 (8th Cir.1981). This conduct constitutes intentional infliction of emotional distress upon plaintiffs. *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). However, the evidence is deficient in demonstrating that the emotional distress sustained is "so severe resulting in bodily harm."

6. Defendants maintain an at-large election system for the election of school board members for the discriminatory purpose of limiting the opportunity of black patrons to participate effectively in the political process, to elect board members of their choice and to prevent blacks

from replacing white board members. In essence, Humnoke's at-large election procedure dilutes the black votes and thus constitutes an unconstitutional infringement of right to vote because the evidence establishes an intentional and purposeful discriminatory purpose. *Perkins v. City of West Helena, Arkansas,* 675 F.2d 201 (8th Cir.1982); *United States v. Uvalde Consolidated Independent School District,* 625 F.2d 547 (5th Cir. 1980); *Nevett v. Sides,* 571 F.2d 209 (5th Cir.1978).

Plaintiffs have standing to challenge Humnoke's at-large election procedure. *Rogers v. Paul,* 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265.

In order to redress the wrongs found herein, the Court orders:

1. The district shall, within thirty days from the date of this memorandum opinion and order, subject to the approval of the Court and input on the part of plaintiffs, establish a bi-racial committee representing a cross-section of the patrons of the Humnoke School District.

2. The district, subject to input by the bi-racial committee and the Court's approval, shall establish objective, nondiscriminatory criteria for recruitment, employment, retention, promotion and discharge of faculty and staff, shall establish a salary schedule based on objective, nondiscriminatory criteria without incumbent white faculty and staff being given greater preference and favor over black faculty and staff; and shall devise a plan, to achieve racial balance of the faculty within a certain time frame, with preference being given to blacks who have been rejected in the past. *Kemp v. Beasley,* 389 F.2d 178 (8th Cir.1968; *Haney v. County Board of Education of Sevier County,* 429 F.2d 364 (8th Cir. 1970).

3. The district, subject to input by the bi-racial committee and the Court's approval, shall revise the district's assertive discipline procedure to the end that all subjective criteria be removed and uniform and objective guidelines established in order to eliminate the opportunity to administer discipline on an uneven handed basis.

4. The district's objective policies in the recruitment, employment and promotion of faculty and staff; the objective salary schedule; the plan for achieving racial balance of the faculty; and the revised assertive discipline procedure shall be filed with the Clerk of this Court on or before January 2, 1986.

5. The Court is scheduling a hearing on December 12, 1985, at 9:30 a.m. o'clock in order to afford counsel and the respective parties the opportunity to offer proof and make recommendations relative to a time frame for requiring the district to discontinue the use of the at-large election procedure for the election of board members and recommend to the Court an alternative system to comport with the Court's holding in this regard.

6. Defendants, their agents and employees, are hereby enjoined to initiate promptly an affirmative program designed to eliminate the racial atmosphere that is so pervasive in the Humnoke School System. Defendants should keep in mind, in complying with this requirement, that they have a duty and responsibility to provide a wholesome environment for all students of the district irrespective of their race and color.

7. Plaintiff, Clyde Sherpell, has failed to establish that he is entitled to relief on his claim for assault and battery, and accordingly, this claim is dismissed with prejudice.

8. The Court retains jurisdiction to insure the correction of the constitutional and legal infirmities found herein.

Counsel for both plaintiffs and defendants are directed to call to the attention of the Court, within ten (10) days of the file date of this order, any issue tendered for adjudication which the Court has not addressed.